UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARY JARVIS, *et al.*,

                      Plaintiffs,

        -against-                                5:14-cv-1459 (LEK/TWD)

GOVERNOR ANDREW CUOMO, in His
Official Capacity as Governor of the State
of New York, *et al.*,

                      Defendants.

## **MEMORANDUM-DECISION and ORDER**

**I.    INTRODUCTION**

The instant case was commenced by ten individuals (collectively, "Plaintiffs") who operate home child care businesses in the State of New York (the "State" or "New York"). Dkt. No. 1 ("Complaint") ¶ 1. Plaintiffs assert that State law authorizing child care providers to designate a representative to collectively bargain with the State violates Plaintiffs' First Amendment rights. Id. Presently before the Court are partial Motions to dismiss filed by Defendants Andrew Cuomo and Sheila J. Poole (together, "State Defendants") and Defendant Civil Service Employees Association, Inc. ("CSEA") (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos. 16 ("CSEA Motion"); 16-1 ("CSEA Memorandum"); 17 ("State Motion"); 17-1 ("State Memorandum"). For the following reasons, Defendants' Motions to dismiss are granted.

**II.    BACKGROUND**

New York subsidizes child care expenses of qualified low income families through various programs, the principal of which is the "State Child Care Block Grant" program. Compl. ¶12 (citing 18 N.Y. COMP. CODES R. & REGS. § 415, *et seq.*). Enrolled families can choose among

eligible providers, 18 N.Y. COMP. CODES R. & REGS. § 415.4(c), and depending on their income level, must contribute towards the cost of the child care services, id. § 415.3. The State Child Care Block Grant program is administered by the New York Office of Children and Family Services ("OCFS") and county social service districts. Compl. ¶ 12. The social service districts determine eligibility for the program, maintain waiting lists for eligible families, and disburse subsidy funds to providers. 18 N.Y. COMP. CODES R. & REG. § 415.2(d)(3); 415.4. OCFS sets market rates for the compensation of providers by county. Id. § 415.9. OCFS also imposes requirements on providers offering services to families that receive subsidies, id. § 415.12, and sets "minimum quality program requirements for licensed and registered day care homes, programs, and facilities," 1 N.Y. SOC. SERV. § 390(2-a)(a).

On May 8, 2007, then New York Governor Eliot Spitzer issued Executive Order No. 12, "Representation of Child Care Providers," which stated that "child care providers should be given the option to organize themselves and select representatives for the purpose of discussing with the State the conditions of their employment." 9 N.Y. COMP. CODES R. & REGS. § 6.12. Order No. 12 divides child care providers into four distinct "representation units": (i) all subsidized day care providers and informal providers in New York City; (ii) all unsubsidized day care providers in New York City; (iii) all day care homes outside of New York City; and (iv) all subsidized informal providers outside of New York City. Id. § 6.12(2). The Order mandates that the State shall recognize the representative designated as such by a majority of a unit of child care providers. Id. § 6.12(3). OCFS is required to meet with a designated representative to discuss State child care policies and to enter into a written agreement, which may address "the stability, funding and operation of child care programs; expansion of quality child care; and improvement of working

2

conditions, including subsidies, benefits or payment, for child care providers." Id. § 6.12(7). OCFS and the designated representative shall jointly seek any legislation, appropriations, or regulations necessary to implement any agreement. Id. § 6.12(9). The Order does not "render any child care provider a state officer or public employee." Id. § 6.12(11)(b). Nor does it "interfere with any ability that child care providers, or any organization that represents such providers, may otherwise have to meet or correspond with, or otherwise appear before, state agencies in regard to any matter of relevance, including any matter under discussion or set forth in any agreement between the state agency and a unit representative." Id. § 6.12(11)(e).

On June 18, 2008, then Governor David Patterson issued Executive Order No. 9, which extended Executive Order No. 12. Compl. ¶ 20. On October 1, 2010, the State effectively codified Executive Order No. 12 by enacting Chapter 540 of the Laws of 2010 (the "Representation Act"). Id. ¶ 23 (citing N.Y. LABOR LAW art. 19-C §§ 695a-695g). The Representation Act enables child care providers "to organize themselves and select representatives for the purpose of discussing with the state the conditions of their employment, the stability of funding and operations of child care programs and the expansion of quality child care." N.Y. LABOR LAW § 695-a. Under the Representation Act, the State shall recognize the majority designated representative of a child care unit and OCFS shall meet with the representative for the purpose of entering into a written agreement. Id. §§ 695-d; 695-e. The Representation Act reiterates that nothing therein shall render a child care provider a state officer or employee, id. § 695-g(2), nor shall it interfere with the ability of child care providers "to meet or correspond with any state agency with regard to any matter of relevance," id. § 695-g(5).

In July 2007, the State certified CSEA as the exclusive representative of all day care homes

3

outside of New York City, based on the submission of authorization cards. Compl. ¶ 18. That representation unit encompasses Plaintiffs. Id. The State and CSEA entered into a memorandum of agreement ("Agreement") effective October 1, 2009. Id. ¶ 21. The Agreement addresses, *inter alia*, compensation, dispute resolution, and training, and creates a quality grant program. See Dkt. No. 1-1 ("Agreement").

The Agreement also included a provision to seek legislation to authorize "fair share" fees from child care providers who did not join CSEA. Id. § 3(l)(vi). On July 2, 2010, the State enacted legislation authorizing the collection of fair share fees from non-member child care providers in each representative unit. Compl. ¶ 22. On September 27, 2013, the State amended the law so that it will not expire until September 30, 2016. Id. ¶ 26. However, on June 30, 2014, the Supreme Court held in Harris v. Quinn, 134 S. Ct. 2618, 2626 (2014), that the First Amendment prohibited the collection of agency fees from personal assistants who either did not support or were non-members of the union. Plaintiffs received a letter from CSEA in November 2014, stating that in order to comply with Harris, "CSEA has requested that the State stop deducting fair share fees from non-members," and that "[the State] is reviewing and modifying its system to accomplish this." Compl. ¶ 33.

Plaintiffs' Complaint alleges two causes of action pursuant to 42 U.S.C. § 1983. First, Plaintiffs claim that the Representation Act forces Plaintiffs into a mandatory agency relationship with CSEA and compels them to associate with CSEA and its expressive activities in violation of Plaintiffs' First Amendment rights. Id. ¶ 36. Second, Plaintiffs claim that the collection of fair share fees violates their First Amendment rights. Id. ¶ 39. Defendants move to dismiss Plaintiffs' first cause of action for failure to state a claim upon which relief can be granted pursuant to Federal

Rule of Civil Procedure 12(b)(6). CSEA Mem. at 1-2; State Mem. at 1. State Defendants also move to dismiss Plaintiffs' Complaint to the extent that it seeks monetary damages against the State. State Mem. at 2.

## III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also FED. R. CIV. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in a plaintiff's favor. See Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).

## IV. DISCUSSION

The First Amendment guarantees "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. Jaycees, 468 U.S. 609, 618 (1984). Freedom of association "plainly presupposes a freedom not to associate." Id. at 623. Compelled association may therefore infringe on a "group's freedom of expressive association." Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Gp. of Bos., 515 U.S. 557, 574-75 (1995).

Plaintiffs claim that the State is violating their First Amendment rights by forcing them to associate with CSEA in two ways: (1) Plaintiffs are forced to accept CSEA as their "mandatory representative"; and (2) Plaintiffs are forced to associate with CSEA's "expressive activities," such as its petitioning, contracts, and policy positions. Compl. ¶ 36. Neither theory is viable in light of

5

controlling Supreme Court precedent that exclusive representation by a union does not violate First Amendment associational rights.

**A. Supreme Court Precedent**

The Supreme Court's holding in <u>Minnesota v. Knight</u>, 465 U.S. 271 (1984), that exclusive representation by a union does not violate non-union members' First Amendment rights, encompasses Plaintiffs' claims.

*1. <u>Minnesota v. Knight</u>*

<u>Knight</u> involved a constitutional challenge by community college faculty members to the Minnesota Public Employment Labor Relations Act ("PELRA"), which established a system of collective bargaining for public employees. 465 U.S. at 273-74. The PELRA enabled public employees to designate an exclusive representative with whom employers were required to "meet and negotiate" regarding "terms and conditions of employment," and to "meet and confer" with on matters related to employment, but outside of the scope of mandatory negotiations. <u>Id.</u> at 274. The Minnesota Community College Faculty Association ("MCCFA") was selected as the exclusive representative of the faculty of the state's community colleges. <u>Id.</u> at 276.

Non-MCCFA faculty brought suit challenging the constitutionality of MCCFA's role as exclusive representative in the "meet and negotiate" and "meet and confer" processes. <u>Id.</u> at 278. The district court, relying on <u>Abood v. Bd. of Educ.</u>, 431 U.S. 209 (1977), rejected the plaintiffs' arguments against the "meet and negotiate" provision because the process related to the terms and conditions of employment. <u>Knight v. Minn. Comm'y Coll. Faculty Ass'n</u>, 571 F. Supp. 1, 4-5 (D. Minn. 1982). The Supreme Court summarily affirmed the district court's judgment on the "meet and negotiate" provision. <u>Knight</u>, 465 U.S. at 279.

6

The district court, however, found that the "meet and confer" provision was unconstitutional, in part because it infringed the plaintiffs' "First Amendment associational rights." Minn. Comm'y Coll., 571 F. Supp. at 10. The Supreme Court reversed. Knight, 465 at 280. With respect to the plaintiffs' associational rights, the Supreme Court stated that the PELRA "in no way restrained [the plaintiffs'] freedom to speak on any education-related issue or their freedom to associate or not associate with whom they please, including the exclusive representative." Id. at 288. The Knight Court further stated:

> [The plaintiffs'] associational freedom has not been impaired. [The plaintiffs] are free to form whatever advocacy groups they like. They are not required to become members of MCCFA . . . [The plaintiffs] may well feel some pressure to join the exclusive representative in order to give them the opportunity to serve on the 'meet and confer' committees or to give them a voice in the representative's adoption of positions on particular issues. That pressure, however, is no different from the pressure they may feel to join MCCFA because of its unique status in the 'meet and negotiate' process, a status the Court has summarily approved. Moreover, the pressure is no different from the pressure to join a majority party that persons in the minority always feel. Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom.

Id. at 289-90. For the same reasons, the designation of CSEA as the exclusive representative of child care providers does not deprive Plaintiffs of their associational rights. Plaintiffs are not compelled to join CSEA, and are free to associate with whomever they choose and otherwise express their views. This includes the right "to meet or correspond with any state agency with regard to any matter of relevance." N.Y. LABOR LAW § 695-g(5).

Plaintiffs claim that the associational argument in Knight "concerned only whether *excluding* employees from union bargaining sessions impinged on their associational rights because it indirectly pressures employees to join the union." Dkt. No. 21 ("Response") at 17. Plaintiffs assert that their argument is distinguishable because Plaintiffs are asserting a "right not to be forced to

7

associate with CSEA against their will." Id. at 18.

However, Knight's holding is broader than Plaintiffs suggest. The Supreme Court's language indicates that it broadly considered whether exclusive representation by MCCFA infringed the plaintiffs' associational rights. Knight, 465 U.S. at 288. The Court explicitly stated that Minnesota had not restrained the plaintiffs' "freedom to associate or not to associate with whom they please," id. at 288, and that the plaintiffs were "free to form whatever advocacy groups they like," id. at 289. Plaintiffs focus on the Court's framing of the issue as whether "Minnesota's restriction of participation in 'meet and confer' sessions to the faculty's exclusive representative" infringed the plaintiffs' associational rights. Resp. at 17 (citing Knight, 465 U.S. at 288). However, the fact that in the context of the PELRA the exclusive representative participates in the "meet and confer" sessions does not mean that the Court's consideration of the impact on the plaintiffs' associational rights was so limited. Two other district courts have similarly read Knight as addressing whether exclusive representation by a union infringes non-members' associational rights. See D'Agostino v. Patrick, No. 14-cv-11866, 2015 WL 1137893, at *3-5 (D. Mass. Mar. 13, 2015); Bierman v. Dayton, No. 14-3021, 2014 WL 5438505, at *7 (D. Minn. Oct. 22, 2014).

    *2. Harris v. Quinn*

Plaintiffs further claim that Abood is the controlling decision on the constitutionality of exclusive representation, and that the Supreme Court's recent decision in Harris v. Quinn, 134 S. Ct. 2618, held that Abood does not extend to individuals who are not "full-fledged state employees," id. at 2638, such as Plaintiffs. Resp. at 19. The Court does not agree with Plaintiffs' reading of Harris.

Harris concerned the collection of fair share fees to support union activities from personal assistants who were not members of the elected union. 134 S. Ct. at 2626. The Supreme Court

8

declined to extend Abood to individuals who were not full-fledged public employees, and applying "exacting First Amendment scrutiny," found the collection of fair share fees unconstitutional. Id. at 2639, 2644. The Supreme Court, however, carefully specified that it was not addressing the exclusive representation of the personal assistants by the elected union. Id. at 2640. The Harris plaintiffs did "not challenge the authority of the [union] to serve as the exclusive representative of all the personal assistants in bargaining with the State." Id. at 2640. Furthermore, the Supreme Court noted that "[a] union's status as exclusive bargaining agent and the right to collect an agency fee from non-members are not inextricably linked," id., an assumption the Court found that the Abood Court had made, id. at 2634.

Thus, the Court finds that it does not follow from Harris that a union's exclusive representation of partial public employees would therefore infringe those employees' associational rights. See D'Agostino, 2015 WL 1137893, at *5; Bierman, 2014 WL 5438505, at *9.

**B. Plaintiffs' Arguments**

Considered on their own terms, Plaintiffs' arguments fail to state a viable claim under the First Amendment.

*1. Mandatory Agency Relationship*

Plaintiffs first argue that by designating CSEA as the exclusive representative of child care providers, New York is necessarily compelling Plaintiffs to associate with CSEA. Resp. at 8. New York, Plaintiffs claim, has made CSEA Plaintiffs' mandatory agent. Id. at 9.

Although vague, Plaintiffs appear to claim that the mere fact of CSEA's exclusive representation of child care providers unconstitutionally associates them with CSEA. See id. at 16. However, that argument is clearly foreclosed under Knight. 465 U.S. at 288-89. New York does

not compel Plaintiffs to join CSEA, or to take any action. Plaintiffs are entitled to associate with whomever they choose and can express whatever views they choose. Moreover, Plaintiffs are entitled "to meet or correspond with any state agency with regard to any matter of relevance." N.Y. LABOR LAW § 695-g(5).

Alternatively, Plaintiffs might be understood to argue that Plaintiffs are associated with CSEA insofar as it is their agent and therefore owes Plaintiffs a duty of impartiality. See Resp. at 8-9. A union is obligated to "fairly and equitably" represent union and non-union employees in the relevant unit. Abood, 431 U.S. at 221. To the extent that Plaintiffs rely on CSEA's role as their agent, that argument has been rejected by both the D'Agostino and Bierman courts. D'Agostino, 2015 WL 1137893, at *6; Bierman, 2014 WL 5438505, at *8. The duty of impartiality only imposes obligations on CSEA. As the Bierman court stated,

> Plaintiffs owe no corresponding duty to [CSEA]. Plaintiffs cite no authority for the proposition that the imposition of a legal duty on an entity impermissibly burdens the rights of the *beneficiaries* of that duty. In any event, the duty of fair representation protects bargaining members' rights not to associate with the union. It bars the union from discriminating against them when bargaining and administering a collective bargaining agreement.

Bierman, 2014 WL 5438505, at *8 (citing Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 556 (1991) (Scalia, J., concurring in part and dissenting in part)). The Court now adopts the reasoning expressed in Bierman in rejecting this argument.

Plaintiffs also rely on Mulhall v. UNITE HERE Local 355, 618 F.3d 1279 (11th Cir. 2010), for the proposition that a union's exclusive representation can infringe associational rights. Resp. at 9. However, Plaintiffs' reliance is misplaced; the Mulhall court only found that exclusive representation by a union implicated the plaintiff's associational rights for the purposes of standing

10

under the Labor Management Relations Act. Mulhall, 618 F.3d at 1286-88; see also D'Agostino, 2015 WL 1137893, at *7. Mulhall's holding that exclusive representation by a union may constitute an injury-in-fact for the purposes of standing is insufficient to support Plaintiffs' claim.

### 2. *CSEA's Expressive Activities*

Plaintiffs also argue that they are necessarily associated with CSEA's "petitioning, contracts, and policy positions." Resp. at 10-11. Plaintiffs assert that the nature of an agency relationship is that the represented parties are affiliated with the positions adopted by the representative. Id. Plaintiffs argue that this violates the principle that "the government cannot compel citizens to affiliate themselves with messages with which they disagree." Id. at 10 (citing Hurley, 515 U.S. 557; Branti v. Finkel, 445 U.S. 507 (1980); Wooley v. Maynard, 430 U.S. 705 (1975)).

The Court finds that Plaintiffs are not unconstitutionally affiliated with CSEA's expressive activities. The public's perception is relevant in forced association cases. Wash. State Grange v. Wash. State Rep. Party, 552 U.S. 442, 459 (2008) (Roberts, C.J., concurring). In Hurley, for example, the Supreme Court held that the organizers of a parade could not be compelled to include a group they wished to exclude. 515 U.S. at 566. Inclusion of the group, the Court stated, "would likely be perceived as having resulted from [the organizers'] customary determination about a unit admitted to the parade, that its message was worthy of presentation and quite possibly of support as well." Id. at 575; see also Dale, 530 U.S. at 653 (holding that forced inclusion of gay scoutmaster in Boy Scouts would "send a message . . . [to] the world" that the Boy Scouts approved of homosexual conduct). CSEA's representation of Plaintiffs would not be likely to create the perception that Plaintiffs endorse CSEA's expressive activities. D'Agostino, 2015 WL 1137893, at *7-8. A reasonable person would not perceive that the activities of CSEA, as a majority-elected

11

representative, N.Y. LABOR LAW § 695-d(1), are identical with the views of the providers it represents.

Plaintiffs attempt to avoid the force of the Supreme Court's forced association decisions by arguing that "[i]rrespective of whether [Plaintiffs] agree with CSEA's petitioning and policy positions, the dispositive fact is that all providers have been *associated* with CSEA's petitioning and policy positions." Resp. at 11. However, a group cannot make a forced association claim "simply by asserting that mere association would impair its message." Rumsfeld v. Forum for Academic & Inst. Rights, Inc., 547 U.S. 47, 69 (2006).

Plaintiffs' attempts to characterize CSEA's representation as infringing their right to "lobby" or "petition" the government are also unavailing. See Resp. at 12-15. Again, CSEA's representation does not compel or restrict Plaintiffs' actions, nor would Plaintiffs be perceived to be affiliated with CSEA's positions.

### 3. *Summary*

For the foregoing reasons, Plaintiffs' arguments that CSEA's exclusive representation violates their First Amendment associational rights fail to state a legally cognizable claim.

### C. Monetary Damages Against State

The Complaint, in part, seeks monetary damages. Compl. at 12. State Defendants move to dismiss the Complaint insofar as it seeks monetary relief against them. State Mem. at 2. The Eleventh Amendment bars claims for monetary relief against states, Edelman v. Jordan, 415 U.S. 651, 663 (1974), and accordingly, to the extent the Complaint seeks monetary relief against State Defendants, those claims are dismissed with prejudice.

### V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant CSEA's Motion (Dkt. No. 16) to dismiss Plaintiffs' first cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED**; and it is further

**ORDERED**, that State Defendants' Motion (Dkt. No. 17) to dismiss Plaintiffs' first cause of action and any claims for monetary damages pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED**; and it is further

**ORDERED**, that any claims for monetary damages against State Defendants are **DISMISSED with prejudice**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     April 30, 2015
               Albany, NY

_____
Lawrence E. Kahn
U.S. District Judge